# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____
)
Altova, Inc. and Altova GmbH,        )
)
)
        Plaintiffs,     )    Civil Action No._____
)
v.                        )    Jury Trial Requested
)
Embarcadero Technologies, Inc.,     )
)
        Defendant.     )
_____)

## COMPLAINT

## INTRODUCTION

Defendant Embarcadero Technologies, Inc. ("Embarcadero") intentionally launched its most recent software product in a way that misappropriates, trades on, and profits from the goodwill and reputation of Altova, Inc. and Altova GmbH (collectively, "Altova") and their well-known software products and other leading XML, database, and UML tools.  Altova is known throughout the country and the world for being a key player in the software tools industry and the leader in XML development tools.  Altova's federally registered marks, including XMLSPY, MAPFORCE, DIFFDOG and many others, are incontestable and have come to be strongly associated with Altova.  Altova's products directly compete with those offered by Embarcadero.

In the late 2011 or early 2012, Embarcadero began extensively using Altova's trade name and trademarks in an effort to market and promote its new product. Specifically, Embarcadero launched a new product under the name AppWave, which

Embarcadero claims to transform a standard PC application into a self-contained "app" for distribution via Embarcadero's AppWave browser.

In 2010, Embarcadero approached Altova seeking permission to include Altova software within AppWave, and Altova refused.   In 2011, Embarcadero sought a partnership again, and Altova refused.  Blatantly disregarding Altova's explicit refusal to be affiliated with AppWave, Embarcadero proceeded to include nine (9) Altova software tools, and, in fact, highlight, Altova's leading products sold under the marks XMLSPY, DATABASESPY, and MAPFORCE, as it introduced AppWave to the market. Embarcadero went so far as to create a special edition of AppWave specifically for the XMLSPY software, and branded it "AppWave for XMLSpy."  Embarcadero then proceeded to prominently feature Altova's trademarks and logos in its marketing and promotional materials for AppWave, including in worldwide press releases, articles, videos, and on its own website.  Indeed, Embarcadero dedicated an entire page on its website to the unauthorized XMLSPY edition of AppWave.  In an effort to further associate itself with Altova's products, Embarcadero has also taken wholesale Altova's copyrighted artwork that it uses in connection with its products.   Embarcadero extensively features these images on the Embarcadero website and within the AppWave software.

Embarcadero's conduct is willful and egregious, and is in flagrant disregard of Altova's rights and its repeated demands that its name, marks, and products not be used in connection with the AppWave software.   The unlawful acts of Embarcadero are causing serious and irreparable harm to Altova.   Altova accordingly seeks injunctive relief and damages for acts of trademark and copyright infringement and unfair

competition, in violation of the laws of the United States and the Commonwealth of Massachusetts.

## PARTIES

1.     Plaintiff Altova GmbH ("Altova GmbH") is an Austrian corporation with its principal place of business at Rudolfsplatz 13a/9, A-1010, Vienna, Austria.

2.     Plaintiff Altova, Inc. ("Altova, Inc.") is a corporation organized under the laws of Delaware, with a principal place of business located at 900 Cummings Center, Suite 314-T, Beverly, Massachusetts 01905.   Altova, Inc. is a wholly owned subsidiary of Altova GmbH.

3.     Defendant Embarcadero Technologies, Inc. ("Embarcadero") is a corporation organized under the laws of Delaware, with a principal place of business located at 100 California Street, 12th Floor, San Francisco, California 94111.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1338 (copyright, trademark and unfair competition claims).   The federal claims include infringement and unfair competition under the Lanham Act and infringement under the Copyright Act.

5.     The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the suit is between parties of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

6.     This Court has jurisdiction over the state law and common law claims under the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367.   The state and common law

claims arise from or are substantially related to the same acts giving rise to the federal claims.

7.      This Court has personal jurisdiction over Defendant Embarcadero under Mass. Gen. Laws Ch. 223A, § 3, because, inter alia, Embarcadero conducted and continues to conduct business in the state of Massachusetts when it sells its products to customers in Massachusetts.  Embarcadero commits acts of trademark and copyright infringement and unfair competition while using Altova's trademarks and copyrighted works without its authorization in a scheme to advertise, promote and sell its own products, including in Massachusetts.

8.      Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the infringing activity and unfair competition occurred and continues to occur in the District of Massachusetts; and 28 U.S.C. § 1391(c) because Plaintiff Altova, Inc. has its principal place of business in the District of Massachusetts.

## FACTUAL BACKGROUND

### Altova

9.      Plaintiff Altova, Inc. is a wholly owned subsidiary of Plaintiff Altova GmbH. The marks at issue in this matter are owned by Altova GmbH and used under license by Altova, Inc.  The plaintiffs will collectively be referred to herein as "Altova."

10.     Altova has been conducting business since 1992 and over the past twenty years has become extremely well known as a key player in the software tools industry and the leader in XML development tools.   XML, which stands for "Extensible Markup Language" is the universal format for structured documents and data on the Web.  XML alleviates many of the interoperability problems associated with the sharing of documents

and data.   Altova's award-winning XML software products are used by development teams in companies of all sizes who rely on Altova's products for projects such as web development, document management, data integration, database management, business process automation, and web services development.

11.     Altova has over four million users worldwide, including approximately 91 percent of the Fortune 500 companies.

12.     Altova has invested considerable time, money, and effort in designing its suite of products and in ensuring that its products have user-friendly features that simplify projects and allow users to produce higher-quality applications.   Altova also provides support and maintenance services for its software products which are delivered by highly qualified customer service engineers.   Consumers have come to expect from Altova high quality tools for use in their application development and database management projects.

13.     Altova's  clients include 3M, America Online, Amazon.com, American Express, Canon, Cisco, Dell, Hewlett Packard, Marriott, Microsoft, New York Times Digital, Oracle, Pfizer, Sony, and Sprint, just to name a few.

14.     Altova has received numerous industry awards and recognitions for its products, including: the "TechXtend Riding the Crest" award; the ComponentSource Top 10 Best Selling Publisher, Top 25 Best Selling Product, and #3 Best Selling Publisher Awards; the Windows IT Pro Editors' Choice Award Best Interoperability Product Gold Award; the SD Times 100 List; the Jolt Product Excellence Award, the Developer.com Product of the Year Finalist; SQL Server Magazine Editor's Best Award; Visual Studio Readers Merit Award; Programmer's Paradise Riding the Crest Award; and many others.

15.     Altova has also invested considerable time, money, and effort in promoting its trademarks used in connection with its products, and in building up the goodwill associated with its marks.  By virtue of these efforts, Altova has developed substantial recognition and goodwill in its trademarks.

16.     Altova's marks have been featured in all of the above-referenced publications, as well as many other national publications including TechRepublic, BC Blog Critics, Asp.netPRO Magazine, About.com, TechNet Magazine, Redmond Magazine, DMReview.com, Database Trends & Applications, Application Development Trends Magazine, MSDN Magazine, and many others.

17.     Altova's marks are also frequently displayed at software industry events in which Altova participates, including the Microsoft TechEd conference, the Oracle OpenWorld conference, the DevConnections conference, the JavaOne conference, and many others.

18.     Since at least as early as 1999 and continuing without interruption, Altova has used its XMLSPY mark in connection with software, and it has used its ALTOVA mark and trade name since at least as early as 2000.  Altova has also used its well-known marks MAPFORCE and DIFFDOG, and others for nearly ten years.

19.     Altova GmbH owns a number of federal trademark registrations for its marks (referred to collectively as "Altova Marks").  These registrations include the following:

    a.  U.S. Reg. Nos. 2,755,777 and 3,130,883 for the marks ALTOVA and ALTOVA (stylized) for use in connection with software in Class 9 and software design services in Class 42, registered August 26, 2003 and August 15, 2006, respectively.  The ALTOVA mark was first used in 2000. Combined Declarations of Use & Incontestability under 15. U.S.C. Sections

1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and accepted in connection with these registrations; therefore these federal trademarks are now incontestable.

b. U.S. Reg. No. 3,175,164 for the mark ALTOVAXML for use in connection with software in Class 9, registered November 21, 2006.  The ALTOVAXML mark was first used in 2005.   Combined Declarations of Use & Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and accepted in connection with this registration; therefore this federal trademark is now incontestable.

c. U.S. Reg. Nos. 2,673,569, 4,074,322, 2,883,589, and 3,134,071 for the marks XML SPY, XMLSPY,X XMLSPY (plus design), and X (plus design) in connection with software in Class 9, registered on January 14, 2003, December 20, 2011, September 14, 2004, and August 22, 2006, respectively. The XMLSPY mark was first used in 1999.  Combined Declarations of Use & Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and accepted in connection with the registrations for XML SPY, X XMLSPY (plus design), and X (plus design); therefore these federal trademarks are now incontestable.

d. U.S. Reg. No. 3,005,136 for the mark DIFFDOG for use in connection with software in Class 9, registered October 4, 2005.  The DIFFDOG mark was first used in 2005.  Combined Declarations of Use & Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were

filed and accepted in connection with this registration; therefore this federal trademark is now incontestable.

e.  U.S. Reg. Nos. 2,931,826 and 3,083,431 for the marks MAPFORCE and MAPFORCE (plus design) in connection with software in Class 9, registered March 8, 2005 and April 18, 2006, respectively.  The MAPFORCE mark was first used in 2003.  Combined Declarations of Use & Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and accepted in connection with these registrations; therefore these federal trademarks are now incontestable.

f.  U.S. Reg. Nos. 2,793,951, 2,807,915 and 3,124,647 for the marks AUTHENTIC, A AUTHENTIC (plus design), and A (plus design) in connection with software in Class 9, registered December 16, 2003, January 27, 2004, and August 1, 2006 respectively.  The AUTHENTIC mark was first used in 2002.  Combined Declarations of Use & Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and accepted in connection with these registrations; therefore these federal trademarks are now incontestable.

g.  U.S. Reg. Nos. 3,209,616 and 3,564,236 for the mark SCHEMAAGENT and the SchemaAgent design, for use in connection with software in Class 9, registered February 13, 2007 and January 20, 2009, respectively.  The SCHEMAAGENT mark was first used in 2005.

h.  U.S. Reg. Nos. 3,266,043 and 3,564,240 for the mark SEMANTICWORKS and the SemanticWorks design, for use in connection with software in Class 9,

registered July 17, 2007 and January 20, 2009, respectively.    The
SEMANTICWORKS mark was first used in 2005.

i.    U.S. Reg. No. 3,353,927 for the mark DATABASESPY for use in connection
with software in Class 9, registered December 11, 2007.  This mark was first
used in 2006.

j.    U.S. Reg. Nos. 2,781,420, 2,807,914, and 3,134,077 for the marks
STYLEVISION, S V STYLEVISION (plus design) and the StyleVision
design, for use in connection with software in Class 9, registered November
11, 2003, January 27, 2004, and August 22, 2006, respectively.    The
STYLEVISION mark was first used in 2002.   Combined Declarations of Use
& Incontestability under 15. U.S.C. Sections 1058 and 1065 (Sections 8 & 15
of the Lanham Act) were filed and accepted in connection with these
registrations; therefore these federal trademarks are now incontestable.

k.    U.S. Reg. No. 3,022,047 for the mark UMODEL for use in connection with
software in Class 9, registered November 29, 2005.  This mark was first used
in 2005.  Combined Declarations of Use & Incontestability under 15. U.S.C.
Sections 1058 and 1065 (Sections 8 & 15 of the Lanham Act) were filed and
accepted in connection with this registration; therefore this federal trademark
is now incontestable.

20.    Examples of the stylized Altova Marks are below:

 



21.     Altova's trademark registrations constitute constructive notice to Embarcadero of Altova's ownership of the Altova Marks in connection with the goods identified in its registrations.

22.     On information and belief, Embarcadero had actual notice of the Altova Marks because, inter alia, Altova regularly uses the ® symbol.   Indeed, Embarcadero also consistently uses the ® symbol next to Altova's marks.

23.     Embarcadero also received actual notice of Altova's trademark rights and registrations on September 22, 2010, when representatives from Embarcadero and Altova met to discuss Embarcadero's proposal to integrate the software sold under the XMLSPY mark into one of Embarcadero's tools.

24.     Embarcadero received further actual notice of Altova's trademarks rights and registrations on April 2, 2012, when Altova notified Embarcadero by email that Altova objected to the use of the Altova Marks on the Embarcadero website.   Embarcadero responded by expressly requesting permission to use the ALTOVA and ALTOVA (stylized) mark – a request which was denied by Altova.

**<u>Defendant Embarcadero's Unlawful Conduct</u>**

25.     Defendant Embarcadero is a direct competitor of Altova.   Specifically, Embarcadero's "ER Studio" and "DB Power Studio" products directly compete with XMLSpy, MapForce, Diffdog, DatabaseSpy, and other products offered by Altova.

These are the very same Altova products that Embarcadero has decided to feature in its AppWave platform and to market using the Altova Marks.

26.     On or about September 22, 2010, the Chief Executive Officer of Altova, Alexander Falk (hereafter "Falk"), had an exploratory meeting with the Business Development Manager of Embarcadero, Brad Strutner (hereafter "Strutner").   At the meeting which Embarcadero requested, Strutner proposed a partnership and integrating the software sold under the XMLSPY mark into one of Embarcadero's tools.

27.     On or about October 18, 2010, Strutner spoke with Falk in order to persuade Altova to permit Embarcadero to deliver Altova software via Embarcadero's "All-Access" cloud tools delivery strategy, which includes the AppWave product. Embarcadero claims the AppWave product allows users to download and install any PC software as an "app" in an experience very similar to an "app store" for mobile devices. After reviewing the proposal, Falk declined to have Altova participate in the program. Falk and Strutner continued to engage in e-mail communications throughout the fall of 2011.

28.     On or about December 15, 2011, Strutner sent an unsolicited offer to Falk that Embarcadero wanted to grow through acquisitions and acquire Altova.  Falk immediately declined the offer.

29.     Just about two months ago, on or about April 2, 2012, an employee of Altova, Inc. became aware that the Embarcadero website prominently featured the mark XMLSPY (at http://www.embarcadero.com/appwave/).   Falk immediately sent an e-mail to Stutner which forwarded the link, and objected to the use of the Altova Marks on the Embarcadero website.  The email further requested an explanation of why Embarcadero

had created a special edition of AppWave, called "AppWave for XMLSpy."  Further, Falk requested that the references to Altova and the XMLSpy software be removed immediately.

30.    Strutner responded by requesting permission to use the ALTOVA mark and logo mark, and agreed to "take steps to remove the logo where [Embarcadero] [is] able to identify its placement on [Embarcadero's] website."

31.    On or about April 4, 2012, Falk responded and denied the request for permission to use Altova products on AppWave, and also repeated his demand to remove the Altova Marks from the Embarcadero website.

32.    On April 10, 2012, General Counsel for Altova, David Gast (hereafter "Gast"), sent via certified mail a demand to Embarcadero to cease and desist from using the Altova Marks, destroy all printed and electronic materials that may contain the Altova Marks, destroy all "app" copies of Altova software, and disable the Embarcadero website until such changes could be effectuated.

33.    On April 18, 2012, legal counsel for Embarcadero, Duncan Sharp (hereafter "Sharp"), responded to the demand letter.  Sharp agreed to "take steps to remove any Altova product logos where we are able to identify their placement on our website" but refused to comply with all of Altova's demands regarding use of the Altova Marks.

34.    On April 19, 2012, Gast sent a further email to Sharp reiterating prior demands and emphasized that Altova "do[es] not give Embarcadero permission to (1) use any of the Altova trademarks in any manner, (2) to transform the software to fit with your software, or (3) to distribute the transformed software."  Further, Gast requested a conference call to review the matter.

35.     On or about April 20, 2012, Gast and Sharp spoke via telephone wherein Gast reiterated the demands and Sharp indicated that Embarcadero would only remove graphics but not remove any of the Altova Marks from the website.  Sharp also refused to remove Altova software listings in AppWave.

**Embarcadero's Wrongful Use of Altova Marks On Its Website**

36.     Despite having been refused permission to do so, Embarcadero is prominently displaying Altova's Marks on its website in an effort to promote its AppWave product. Specifically, displayed in the center of the web page is a promotional video which prominently displays the XMLSPY mark and XMLSpy logo.  In the video, the XMLSPY logo is displayed as the central icon above the word "AppWave" on the video.  The video asks the viewer to imagine a scenario in which "you didn't have to deal with licensing and installation hassles." Examples of screenshots of the video in which the Altova Marks appear below:







37.     Upon information and belief, the AppWave for XMLSpy website is intentionally

search engine optimized to increase the rank of the searched term "XMLSPY" in a search

engine query, such as Google.  Further, the title and header information of the website

features the mark XMLSPY, which is also designed to increase search engine priority rankings.  The title of the search engine result, "XMLSpy – Embarcadero Technologies," is also misleading and confusing, in that it leads consumers to believe that it is Embarcadero that owns the XMLSpy software, rather than Altova.  An example is shown below:



38.     Clicking on the above referenced search result leads to a page within the AppWave website which features a set of tabs at the top of the window.  Mousing over the tab labeled "Editions" reveals three options, one of which is "XMLSpy."  Clicking on the option for "XMLSpy" displays a page featuring an edition of AppWave dedicated to XMLSpy.  Therein, as shown below, the marks ALTOVA and XMLSPY are prominently displayed in the title, text, graphics, and header information, with the tagline "Get a better XMLSpy experience with AppWave."



39.     As shown in the above screenshot, Embarcadero has made several misleading and inaccurate statements which create the impression of an affiliation between Altova and Embarcadero.   These statements include "Get a better XMLSpy® experience with AppWave;" "AppWave™ for XMLSpy® lets you manage XMLSpy as an app;" and "Brought to you by Embarcadero Technologies, AppWave for XMLSpy provides a mobile-like experience on your PC."

40.     The AppWave website also contains a section titled "Commercial Apps."   In this section, Embarcadero lists approximately thirty-four (34) commercial applications.   As shown below, Embarcadero uses Altova's registered trademarks ALTOVA, DATABASESPY, and MAPFORCE in connection with the following Embarcadero products:   "Database Spy Enterprise Edition 2011," "DatabaseSpy Professional Edition

2011," "Altova MapForce Basic Edition," "Altova MapForce Enterprise Edition," and "Altova MapForce Professional Edition."



41. Under the "Developer Tools" tab of the above webpage, the marks ALTOVA, DIFFDOG, SCHEMEAGENT, SEMANTICWORKS, STYLEVISION, and AUTHENTIC are prominently displayed, as follows:



42.    In a classic "bait and switch," clicking on any of the icons in the "Commercial Apps" page featuring the Altova Marks triggers a pop-up box which states that the user must install AppWave.  Even worse, the text in the pop-up box states "Get AppWave. It's Free!" which falsely implies that the "app" version of Altova may be accessed for free, without purchase of a license from Altova. The pop-up box appears as follows:



43.    Clicking "Get AppWave. It's Free!" takes the user to a new webpage wherein the user must create an AppWave account and download the AppWave browser software.

44.    Not only does this account creation scheme provide Embarcadero with valuable information about actual and potential Altova customers, the "Commercial Apps" page shown above also creates the false impression that by clicking on the identified software under the Altova Marks, the user will be able to use Altova's software if AppWave is installed.  Altova's software can only be used by consumers who purchase a license from Altova.  This misleading use of the Altova Marks is deceptive conduct on the part of Embarcadero which inevitably leads consumers to wrongly believe that there is an affiliation between Embarcadero and Altova.

**Embarcadero's Wrongful Use of Altova Marks In Its Advertising**

45.    Embarcadero has launched an advertising campaign to promote its AppWave product which is centered on the wrongful use of the Altova Marks.  Upon information

and belief, on or about December 6, 2011, Embarcadero circulated a press release introducing AppWave.  In the press release, Embarcadero claims that "AppWave works with many popular commercial software titles such as: …Altova XMLSpy."

46.    Upon information and belief, Embarcadero distributes a datasheet which promotes AppWave using the XMLSPY mark and logo.  The datasheet prominently features the XMLSPY and logo in the very center, as follows:



47.    Further, the datasheet contains an image of a laptop computer, in which the XMLSPY logo is featured in the top center of the screen. The datasheet describes the process of how AppWave can "transform," "convert," and "master" software applications, such as Altova's software, into an app so that the user may broadcast the app to others.

48.    In addition to direct sales via Embarcadero's website, Embarcadero offers its products throughout the world by way of sales partners.  One such partner, Spectrum Systems, Inc. serves as Embarcadero's authorized reseller to the government and posts offerings on the U.S. Government's General Services Administration sales portal, GSA Advantage.  Such postings misleadingly offer AppWave as a special edition for each of Altova's products.  For example, Spectrum Systems advertises "APPWAVE FOR ALTOVA XMLSPY ENTERPRISE (INSTALLED USER)."  An example of such an advertisement is shown in the below screenshot.  This type of advertisement inevitably

creates confusion amongst GSA consumers.  Further, using an installed user license, as

advertised, would violate the terms of the Altova end user license agreement.



**Embarcadero's Wrongful Use of Altova Marks In Its AppWave Browser**

49.     Embarcadero software transforms PC applications into a package that operate like

a mobile phone "app." To begin the process, the user must download Embarcadero's

AppWave software from the AppWave website.   Once installed and loaded, a list of

software genres are presented on the left column, such as "Database Tools," "Developer

Tools," and "Education."

50.     The Altova Marks are displayed under the heading of "Developer Tools."  When

a user clicks on one of the Altova Marks, such as ALTOVA DIFFDOG, a list appears

displaying all of the AppWave "mastering templates."  A master template is a tool pre-

21

generated by Embarcadero which is utilized in processing software to run as an app.  The

mastering template page appears as follows:



51.    To access the master template and begin the mastering process, a user would then

select one of the Embarcadero created templates by clicking on the image associated with

the selected software title.

52.    Each of the master templates is identified by a graphic or icon.  For Altova

software, Embarcadero copied portions of Altova's marketing material and/or the Altova

user manuals to create the icon, as well as coping Altova's trademarks.  For example, as

shown in the below screenshot, the AppWave template page for "Altova DiffDog"

displays a logo and image that is identical or substantially similar to an image from

Altova's website and/or its software user manual.   The description of the mastering

template also contains text copied from Altova's website and/or user manual.   The prominent use of the DIFFDOG mark and image within the AppWave browser further creates confusion as to the affiliation between Altova and Embarcadero.



53.   Embarcadero appears to be using and advertising an older version of Altova's software rather than the current version, which is misleading and confusing for customers seeking what they believe to be the current version of Altova's products.   This suggests that Altova does not update its software on a yearly basis – a task that Altova takes great pride in doing each year.   For example and as noted above, Embarcadero advertises DiffDog 2011; however, DiffDog 2012 was released in September 2011.

54.   The next step in transforming the software involves "mastering" the software into an app.   The portion of the AppWave browser that creates the app is called the "AppWave Studio."   To start the mastering, the user clicks the link for "Master" under the software title of his or her choice, such as "Altova DiffDog AppWave Template."

Once selected, the AppWave template for DIFFDOG provides a link for the Altova website, and specifically to the download page for the Altova software sold under the DIFFDOG mark.

55.     This process creates the impression that Altova and Embarcadero have partnered together to offer compatible software programs.  However, nothing could be further from the truth.   Despite Altova's denial of Embarcardero's request to enter into such a partnership, Embarcadero chose to forge ahead without Altova's consent.  This decision is undoubtedly creating a false association between Embarcadero and Altova in the minds of consumers.

56.     Once the AppWave template is selected, and the installation file is downloaded, the user must identify the location of the installation file in the AppWave Studio.  The user starts the mastering process by selecting a button called "Record."

57.     After the app is created, the app is available to all users connected to the AppWave network, hosted by the user.   Embarcadero does not require that the appropriate Altova license – a concurrent user license -- be purchased in order to use the Altova software within AppWave.   Embarcadero takes no measures to make users of AppWave aware that they are required to purchase a specific license from Altova. Indeed, Embarcadero's video on its website referred to above promotes a benefit of its product as not "hav[ing] to deal with licensing . . . hassles."

58.     Embarcadero allows Altova's software to be used by several different individuals in a network, even if the organization did not purchase the required concurrent user license from Altova.  Embarcadero is thereby inducing its users to breach the Altova end-user license agreement.

59.    Far from the "better XMLSpy experience" Embarcadero promises, the user experience of Altova's products as "apps" within AppWave is not consistent with the user experience of the software installed in the manner intended by Altova.  For instance, certain features in the XMLSpy software may be linked with other Altova products when used as Altova intended, but these links do not exist in the AppWave version.  When XMLSpy is installed directly on a computer, XMLSpy becomes the default .xml editor.  As a result, clicking on an .xml file will automatically open XMLSpy and allow the user to continue editing the file with XMLSpy.  AppWave disruptions this association.  Also, the user may share documents from the XMLSpy software with the MapForce software, but this functionality does not occur in the AppWave version of XMLSpy.  Because the AppWave version of the software operates within the AppWave browser, it is likely that other functional problems with Altova's software exist when run within the AppWave platform.

### Embarcadero's Wrongful Copying of Altova's Copyrighted Images and Text

60.    Embarcadero not only uses the Altova Marks, but also incorporates product artwork associated with Altova software, for which Altova owns U.S. Copyright Registrations ("Copyrighted Works").  Specifically, the AppWave browser features the Copyrighted Works above each of the Altova Marks, as well as text taken from Altova's website and/or software user manuals.  The Copyrighted Works that are displayed include artwork that is used on Altova's website and/or its software user manuals.  Several examples of the Copyrighted Works used in the AppWave browser are shown in the following screenshots:







61.     As shown in the above screenshots, Embarcadero has lifted images and text wholesale from Altova's software manuals and its website, and embedded them into the AppWave browser.  This adds to the misleading impression that Altova has endorsed or partnered with Embarcadero to offer its software through the AppWave program, which is simply false.

62.     The works that Embarcadero has copied include graphics and text from Altova's software sold under the AUTHENTIC, DIFFDOG, SCHEMAAGENT, DATABASESPY, MAPFORCE, SEMANTIC WORKS, STYLEVISION, UMODEL, and XMLSPY marks.

63.     Altova owns U.S. Copyright Registrations for the below Copyrighted Works, as follows:

a.  Authentic 2011 Desktop Edition software and manual, Registration No. TX 7-348-377, registered December 8, 2010;

b.  DatabaseSpy 2011 software and manual, Registration No. TX 7-348-354, registered December 8, 2010;

c.  DiffDog 2011 software and manual, Registration No. TX 7-348-331, registered December 8, 2010;

d.  MapForce 2011 software and manual, Registration No. TX 7-348-328, registered December 8, 2010;

e.  SchemaAgent 2011 software and manual, Registration No. TX 7-348-718, registered December 8, 2010;

f.  SemanticWorks 2011 software and manual, Registration No. TX 7-348-326, registered December 8, 2010;

g.  StyleVision 2011 software and manual, Registration No. TX 7-348-721, registered December 8, 2010;

h.  XMLSpy 2011 software and manual, Registration No. TX 7-348-335, registered December 8, 2010; and

i.  UModel 2011 software and manual, Registration No. TX 7-348-713, registered December 8, 2010.

True and correct copies of these certificates for the Copyrighted Works are attached as Exhibits A through I, respectively.

64.     Regarding submissions of content and "apps" for Embarcadero's AppWave, Embarcadero maintains a specific policy called the Submission Policy.  The policy may be          found          on          Embarcadero's          website          at

http://docwiki.embarcadero.com/AppWave/en/Submissions_Policy.   The Submission Policy states that "The legal owners of any image or other file used on this site may request the removal of said materials at any time."  On several occasions, Altova has requested that their intellectual property, including Altova Marks, graphics, images, and software be removed, but Embarcadero refuses to do so, in total disregard for its own Submission Policy.

65.    As evidenced by the above examples, Embarcadero has usurped Altova's control over how its products, its marks and its Copyrighted Works are being used.  Altova's business and reputation are being irreparably harmed by Embarcadero's insistence on incorporating Altova's products into its AppWave program and using the Altova Marks and Copyrighted Works without authorization to promote AppWave.

66.    Embarcadero's unauthorized use of the Altova Marks and the Copyrighted Works irreparably injures Altova by falsely associating Altova with its competitor, Embarcadero, and depriving Altova of the rights in its marks and Copyrighted Works, harming Altova's reputation and creating confusion among the public.  Embarcadero's conduct constitutes trademark and copyright infringement, unfair competition and an unfair and deceptive trade practice.

## FIRST CAUSE OF ACTION

### *Federal Trademark Infringement in Violation of Section 32(1) of the Lanham Act* (15 U.S.C. §1114)

67.     Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

68.     Defendant uses the Altova Marks in connection with the sale, offer for sale and advertising of its competitive software products, without authorization from Altova.

69.     Defendant's unauthorized use of the Altova Marks constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, codified at 15 U.S.C. §1114 (1).

70.     Defendant's unauthorized use of the Altova Marks was intended to cause, has caused, is causing, and is likely to continue to cause confusion, or to cause mistake or to deceive.

71.     Upon information and belief, Defendant's infringement of the Altova Marks has been willful, wanton, reckless, and in total disregard of Plaintiffs' rights.

72.     Defendant's unauthorized use of the Altova Marks caused and is likely to continue to cause substantial and irreparable injury to Plaintiffs, which injury cannot be accurately computed at this time, and will continue to cause substantial and irreparable injury unless Defendants' use of the Altova Marks and company name is immediately enjoined by this Court.

73.     By reason of the foregoing, Plaintiffs have been damaged and are entitled to injunctive relief and damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### *Federal Unfair Competition in Violation of the Lanham Act*
### (15 U.S.C. §1125)

74.     Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

75.     Defendant's unlawful acts constitute use in commerce.

76.     Defendant's unlawful acts are likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendant with Plaintiffs as to the origin, sponsorship, or approval of Defendant's goods.

77.     Defendant has engaged in unlawful acts that constitute unfair competition and false designation of origin in violation of § 43(a) of the Lanham Act, codified at 15 U.S.C. 1125(a).

78.     Defendant's acts are causing irreparable injury to Plaintiffs, for which there is, no adequate remedy at law, and will continue to do so unless Defendant's use of the Altova Marks and company name is enjoined by this Court.

79.     By reason of the foregoing, Plaintiffs have suffered monetary damages and loss of goodwill.

80.     Upon information and belief, Defendant's conduct as described above has been willful, wanton, reckless, and in total disregard for Plaintiffs' rights.

### THIRD CAUSE OF ACTION

#### *Disparagement in Violation of the Lanham Act*
#### *(15 U.S.C. §1125(a)(1)(B))*

81.    Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

82.    Defendant has made material misrepresentations or misdescriptions of fact about the nature of Plaintiffs' goods.

83.    Defendant used the false or misleading statements in commerce.

84.    Defendant made the representations in the context of commercial advertising or promotion of its AppWave product.

85.    By reason of the foregoing, Plaintiffs have suffered monetary damages and loss of goodwill.

86.    Upon information and belief, Defendant's conduct as described above has been willful, wanton, reckless, and in total disregard for Plaintiffs' rights.

### FOURTH CAUSE OF ACTION

#### *Copyright Infringement*
#### *(17 U.S.C. §101 et seq)*

87.    Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

88.    The Copyrighted Works are original works of authorship, embodying copyrightable subject matter, and copyrighted under the laws of the United States.

89.    The Copyrighted Works have been registered with the United States Copyright Office.

90.     Plaintiff Altova GmbH is the sole and exclusive owner of all rights, title and interest in and to the Copyrighted Works.

91.     The copyrights in the Copyrighted Works and the facts stated in the certificates are *prima facie* valid under 17 U.S.C. § 410(c).

92.     By its actions alleged above, Defendant has infringed Plaintiffs' copyrights in one or more of the Copyrighted Works in violation of the Copyright Act, 17 U.S.C. § 501, by displaying and distributing the Copyrighted Works on its website, in its AppWave platform, and in its marketing materials.

93.     Defendant had access to one or more of the Copyrighted Works which were available on Altova's website and in its software user manuals prior to displaying and distributing the Copyrighted Works on its website in its AppWave platform, and in its marketing materials.

94.     Defendant or those acting in privity with Embarcadero copied one or more of Altova's Copyrighted Works.

95.     On information and belief, Defendant's acts of infringement have been taken willfully, in knowing disregard, and with intentional indifference with respect to Plaintiffs' rights.

96.     Defendant's copyright infringement and the threat of continuing and future infringement have caused, and will continue to cause, repeated and irreparable injuries to Plaintiffs.

97.     Plaintiffs' remedies at law are not adequate to compensate for the injuries imposed by Defendant's infringements.

98.     Therefore, Plaintiffs require an injunction prohibiting Defendant, its agents, employees and other persons acting in conspiracy, concert or participation with it from infringing, in any manner, Altova's copyrights, and from inducing, aiding, causing or contributing to such infringements by others, in violation of 17 U.S.C. § 502.

99.     As a direct and proximate result of Defendant's infringement of Altova's copyrights in the Copyrighted Works, Plaintiffs have also suffered certain monetary damages.

100.    As a direct and consequential result of Defendant's willful and intentional infringement of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 501, Plaintiffs are entitled to recover from Defendant such actual damages in an amount to be determined at trial, including Plaintiffs' lost profits and/or all of Defendant's profits gained by its infringement, or at Altova's election, statutory damages including damages for willful infringement of up to $150,000 for each infringement, attorneys' fees, costs, and injunctive relief.

## FIFTH CAUSE OF ACTION

### *Unfair Competition and Trademark Infringement in Violation of Massachusetts Common Law*

101.    Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

102.    Plaintiff Altova GmbH is the legal owner of the Altova Marks, which are used under license by Plaintiff Altova, Inc.  Plaintiffs own and enjoy common law rights in its Altova Marks.

103.     Defendant's unauthorized use of the Altova Marks in connection with the sale, distribution, offering for sale, or advertising of software goods is, and has been, committed knowingly in order to capitalize on and misappropriate Plaintiffs' valuable goodwill in its marks that it created through continuous usage of its marks over the past twelve years.

104.     Defendant's unauthorized use of the Altova Marks has caused and is likely to continue to cause confusion or mistake or to deceive consumers as to the source of origin of such services.

105.     Defendant's acts and conduct as set forth herein constitute trademark infringement in violation of Massachusetts common law.

106.     Defendant's acts and conduct as set forth herein constitute unfair competition, willful, unfair and deceptive acts or practices within the Commonwealth of Massachusetts and in violation of Massachusetts common law.

107.     Both Defendant and Plaintiffs are engaged in trade and commerce in the Commonwealth of Massachusetts.

108.     Defendant's wrongful and infringing activities have intended to cause, have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Plaintiffs' business, reputation, and goodwill.

109.     Defendant's conduct as described above has been willful, wanton, reckless, and in violation of the rights of Plaintiffs.

110.     As a result of Defendant's acts alleged above, Plaintiffs are entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### *Unfair Competition in Violation of M.G.L. Ch. 93A*

111.    Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs.

112.    Both Plaintiffs and Defendant are engaged in interstate trade or commerce.

113.    The acts complained of herein occurred primarily and substantially in the Commonwealth of Massachusetts.

114.    Defendant's unauthorized use of the Altova Marks and Copyrighted Works is, and has been, committed knowingly in order to capitalize on and misappropriate Plaintiffs' valuable goodwill in the Altova Marks that it created through long and continuous usage of the Altova Marks over many years.   The acts alleged herein constitute unfair and deceptive practices within the meaning of M.G.L. Ch. 93A, § 11.

115.    Defendant's unfair and deceptive trade practices were knowing and willful.

116.    As a result of Defendant's actions as alleged herein, Plaintiffs have suffered and will continue to suffer a loss of money.

117.    As a result of Defendant's violations of Chapter 93A as alleged above, Plaintiffs are entitled to damages in an amount to be proven at trial, such amount to be doubled or trebled, and an award of reasonable attorneys' fees and costs as provided by statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully asks this Court to enter judgment for Plaintiffs on all counts against Defendant and to grant Plaintiffs the following relief:

1.    An injunction preventing :

a.  Defendant and its respective officers, directors, employees, agents, affiliates, successors, assigns, and all those in privity or acting in concert with it, from using the Altova Marks in connection with goods or services relating to Defendant's software;

b.  Defendant and its officers, directors, employees, agents, affiliates, successors, assigns, and all those in privity or acting in concert with them, from unfairly competing with Altova by making false and misleading statements to prospective Altova customers on Defendant's website and in connection with the AppWave program;

c.  Defendant from in any way using, displaying, advertising, copying, imitating, or infringing upon the Altova Marks;

d.  Defendant from using or displaying the Altova Marks or Copyrighted Works in any website, software program, written or oral advertisements, displays, sales promotions, or in any other public communication in connection with the sale of Defendant's products or services; and

e.  Defendant from otherwise unfairly competing with Plaintiffs, including by making false and misleading statements to prospective Plaintiffs customers.

2.  Order Defendant to pay Plaintiffs the damages which Plaintiffs have sustained by reason of the conduct alleged herein;

3.  Award Plaintiffs all gains, profits, and advantages derived from Defendant's use of the Altova Marks, pursuant to 15 U.S.C. §1117, M. G. L. 110H § 12 and other applicable law;

4.  Award Plaintiffs such damages as it has sustained or will sustain by reason of Defendant's copyright infringement, or, in lieu thereof, should Plaintiffs elect, statutory damages in an amount not less than $150,000 for each infringement, or for such other amount as may be proper pursuant to 17 U.S.C. § 504(c); and/or from Defendant's unfair competition, and unfair trade practices; and pursuant to 15 U.S.C. § 1117 and MGL ch 93A awarding Plaintiffs an amount up to three times the amount of the actual damages sustained as a result of Defendant's violation of the Lanham Act and MGL ch 93A.

5.  Order Defendant to pay pre-judgment interest on Plaintiffs' damages as provided in 15 U.S.C. §1117 and other applicable law;

6.  Award Plaintiffs' costs and disbursements incurred in this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1117 and MGL ch 93A;

7.  Grant such other and further relief as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a jury trial of any issues in this action so triable.

Dated:  June 1, 2012                    Respectfully submitted,

Altova GmbH and Altova, Inc.,
By its Attorneys,

/s/  Jack C. Schecter
Jack C. Schecter, BBO No. 652349
Nicole Rizzo Smith, BBO No. 663853
SUNSTEIN KANN MURPHY &
TIMBERS LLP
125 Summer Street
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004  Fax
jschecter@sunsteinlaw.com
nsmith@sunsteinlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/  Jack C. Schecter
Jack C. Schecter

03708/05001  1647159.1